1  ABRAHAM A. TABAIE (SBN 260727)
   abraham.tabaie@skadden.com
2  EMILY REITMEIER (SBN 305512)
   emily.reitmeier@skadden.com
3  SKADDEN, ARPS, SLATE, MEAGHER &
     FLOM LLP
4  525 University Avenue
   Palo Alto, California  94301-1908
5  Telephone:     (650) 470-4500
   Facsimile:     (650) 470-4570
6

7  EDWARD L. TULIN (*pro hac vice*)
   edward@gishpllc.com
8  ANDREW D. GISH (*pro hac vice*)
   andrew@gishpllc.com
9  RAYMOND J. BILDERBECK (*pro hac vice*)
   ray@gishpllc.com
10 GISH PLLC
   41 Madison Avenue, Floor 31
11 New York, NY 10010
   Telephone:     (212) 518-2000
12

13 Attorneys for Defendant Voyager Labs, Ltd.

14

15                 UNITED STATES DISTRICT COURT

16           FOR THE NORTHERN DISTRICT OF CALIFORNIA

17                    SAN FRANCISCO DIVISION

18

19 META PLATFORMS, INC.,                    Case No. 3:23-cv-00154-AMO

20              Plaintiff,

21        vs.                               **DEFENDANT VOYAGER LABS LTD.'S
                                            REPLY IN SUPPORT OF MOTION AND
22                                          MOTION TO DISMISS FIRST
                                            AMENDED COMPLAINT**
23 VOYAGER LABS LTD.,

24              Defendant.                  Hearing Date: November 16, 2023
                                            Judge: Honorable Araceli Martinez-Olguin
25                                          First Amended Complaint Filed: May 5, 2023

26

27

28

# TABLE OF CONTENTS

I.    Meta Has Failed to Plausibly Plead Breach of Contract..........................................2

    A.    Meta Fails to Plausibly Allege Existence of Agreement with Voyager UK...................................................................................................................2

    B.    Meta Fails to Plausibly Allege That Voyager UK Manifested Assent ........4

    C.    Meta Fails to Sufficiently Allege Alter Ego or Agency Liability................8

II.    The Court Lacks Personal Jurisdiction Over the CFAA and CDAFA Claims ......11

    A.    The Bromley Declaration is Fatal To Meta's Personal Jurisdiction Theories..............................................................................................................11

    B.    Voyager UK Did Not Waive Jurisdiction in the CMS or Prior Correspondence.....................................................................................................12

    C.    Meta's Forum-Selection Clause Theory Fails.............................................14

    D.    Meta Fails to Refute Voyager UK's Evidence That It Lacks "Minimum Contacts" ..........................................................................................15

CONCLUSION.........................................................................................................................15

**1**

**TABLE OF AUTHORITIES**

**2**                                                                                                                    **Page(s)**

**3**  **Cases**

**4**  *Action Embroidery Corp. v. Atl. Embroidery Inc.*, 368 F.3d 1174 (9th Cir. 2004) .............................14

**5**  *Be In, Inc. v. Google Inc.*, No. 12-cv-3373, 2013 WL 5568706 (N.D. Cal. Oct. 9, 2013) ..................6

**6**  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022) ......................................4

**7**  *Born v. Celtic Mktg. LLC*,
      No. 8:19-cv-01950 (JLS) (ADS), 2020 WL 3883273 (C.D. Cal. May 20, 2020) ........................12
**8**
      *Brooke v. Patel*,
**9**      No. 1:20-CV-1106 JLT EPG, 2023 WL 2645648 (E.D. Cal. Mar. 27, 2023) ...............................8

**10**  *City & Cnty. of San Francisco v. Purdue Pharma L.P.*,
        491 F. Supp. 3d 610 (N.D. Cal. 2020) ...........................................................................9
**11**
        *Data Disc, Inc. v. Sys. Tech. Assoc., Inc.*, 557 F.2d 1280 (9th Cir. 1977).............................2
**12**
        *Dependable Highway Express, Inc. v. RIM Logistics, Ltd.*,
**13**      No. 18-cv-04261, 2018 WL 7500276 (C.D. Cal. Sept. 10, 2018) ..........................................3

**14**  *Doe v. Unocal Corp.*, 248 F.3d 915 (9th Cir. 2001) ................................................................2

**15**  *Estate of Miller v. Cnty. of Sutter*,
        No. 2:20-cv-577, 2020 WL 6392565 (E.D. Cal. Nov. 2, 2020) ............................................9
**16**
        *Facebook, Inc. v. Sluchevsky*,
**17**      No. 19-cv-1277, 2020 WL 5823277 (N.D. Cal. Aug. 28, 2020) ..........................................3

**18**  *Finkelstein v. AXA Equitable Life Ins. Co.*,
        325 F. Supp. 3d 1061 (N.D. Cal. 2018) .........................................................................8
**19**
        *Franklin v. Facebook Inc.*,
**20**      No. 1:15-cv-655-LMM, 2015 WL 7755670 (N.D. Ga. Nov. 24, 2015) ....................................5

**21**  *Fteja v. Facebook*, 841 F. Supp. 2d 829 (S.D.N.Y. 2012)..................................................5

**22**  *Goldberg v. Rome McGuigan, P.C.*,
        No. 20-cv-9958-JFW, 2021 WL 3520725 (C.D. Cal. Apr. 23, 2021) .....................................14
**23**
        *Ind. Elec. Supply Inc. v. Solar Installs, Inc.*,
**24**      No. 4:18-cv-1435, 2018 WL 6092800 (N.D. Ca. Nov. 21, 2018) ........................................9

**25**  *James River Ins. Co. v. DCMI, Inc.*,
        No. 11-cv-06345, 2012 WL 2873763 (N.D. Cal. July 12, 2012) .........................................3
**26**
        *Kaar v. Wells Fargo Bank, N.A.*,
**27**      No. 16-cv-01290, 2016 WL 3068396 (N.D. Cal. June 1, 2016)..........................................3

**28**  *Klian v. Crawford*,
        No. 12-cv-2373, 2012 WL 12878721 (C.D. Cal. June 6, 2012)..........................................14

1  *Meta Platforms Inc. v. Soc. Data Trading Ltd.*,
      No. 21-cv-09807, 2022 WL 18806267 (N.D. Cal. Nov. 15, 2022) ..................................................3

2
3  *Meta Platforms, Inc. v. BrandTotal Ltd.*,
      605 F. Supp. 3d 1218 (N.D. Cal. 2022) .......................................................................................3

4  *Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017) ........................................................................7

5  *Misha Consulting Grp., Inc. v. Core Educ. and Consulting Solutions, Inc.*,
      No. 13-cv-04262, 2013 WL 6073362 (N.D. Cal. Nov. 15, 2013) ..............................................3

6
7  *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir. 2014) ........................................................4

8  *Olney v. Job.com, Inc.*,
      No. 1:12-cv-01724-LJO-SKO, 2014 WL 4660851 (E.D. Cal. Sept. 17, 2014)..........................6

9  *Ranza v. Nike Inc.*, 793 F.3d 1059 (9th Cir. 2015) ...............................................................................9

10 *Snow v. Eventbrite, Inc.*,
      No. 20-cv-03698, 2021 WL 3931995 (N.D. Cal. Sept. 2, 2021).................................................5

11
12 *ThermoLife Int'l, LLC v. NetNutri.com LLC*,
      813 F. App'x 316 (9th Cir. 2020)...............................................................................................12

13 *Uniloc 2017 LLC v. H&R Block, Inc.*,
      No. SACV 19-1149 JVS (KESx), 2019 U.S. Dist. LEXIS 229166 (C.D. Cal. Dec. 23, 2019) ......9

14
15 *Walden v. Fiore*, 571 U.S. 277 (2014)..................................................................................................15

16 *Williams v. Apple, Inc.*, 449 F. Supp. 3d 892 (N.D. Cal. 2020)..........................................................3

17 *Women's Recovery Ctr., LLC v. Anthem Blue Cross Life & Health Ins. Co.*,
      No. 8:20-cv-00102-JWH-ADSx, 2022 WL 739522 (C.D. Cal. Feb. 2, 2022) ..........................10

18 *Wynes v. Kaiser Permanente Hosps.*,
      No. 10-cv-0702, 2011 WL 1302916 (E.D. Cal. Mar. 31, 2011)..................................................3

19

20

21

22

23

24

25

26

27

28

1    Although Meta submitted a lengthy opposition to Voyager UK's motion to dismiss ("MTD"),[1]

2  very little of that brief addresses the actual grounds for dismissal.

3    When it comes to Voyager UK's 12(b)(6) motion to dismiss the First Cause of Action, Meta

4  assiduously avoids Voyager UK's primary arguments and on-point caselaw.  But under the most

5  analogous precedent from the Ninth Circuit and this Court—which Meta fails to distinguish or, in

6  many instances, ignores entirely—the FAC fails to place Voyager UK on notice of the online

7  adhesion contracts it has allegedly breached, and fails to allege any facts from which it could be

8  reasonably inferred that Voyager UK manifested assent to any such contract.  Meta's theory of

9  contract formation remains entirely unclear, with fundamental, threshold questions left entirely

10  unanswered by the FAC—including how many contracts Voyager UK is alleged to have entered;

11  whether those are alleged to be clickwrap, browsewrap, or something else; when they are alleged to

12  have been entered; and how Voyager UK allegedly assented or consented to any contract.  Equally

13  unclear is whether Meta is relying on an alter ego or agency theory to support its contract claim.  Meta

14  chastises Voyager UK for "mischaracteriz[ing]," "misunderstand[ing]" and "miscontru[ing]" the FAC

15  as alleging alter ego/agency liability—but then launches into a lengthy discussion of how the FAC

16  arguably alleges alter ego and agency liability.  The FAC fails to plausibly allege either theory, but

17  this contradiction is emblematic of the deficiencies in Meta's FAC.

18    And when it comes to Voyager UK's 12(b)(2) motion to dismiss the Second and Third Causes

19  of Action for lack of personal jurisdiction, Meta's opposition is even more untenable.  Meta asks the

20  Court to transform a single line from Voyager UK's original Case Management Statement ("CMS")—

21  that it would not contest personal jurisdiction solely for Meta's contract claim—into a blanket waiver

22  of personal jurisdiction for all claims, but cites no authority for such a drastic and draconian step.

23  Meta's remaining personal jurisdiction allegations are squarely and unequivocally contradicted by the

24  sworn Bromley Declaration.  But rather than address that Declaration, Meta contends that "the court

25  cannot consider" it, arguing that it should be "disregard[ed]," or, if it is considered, "then any factual

26  dispute it creates must be resolved in Meta's favor."  Meta is wrong on both points.  _First_, while the

27

28
[1] Unless otherwise noted, all emphases have been added and all capitalized terms have the same
meaning as in the MTD.

1  Court should not consider materials outside the FAC for the 12(b)(6) aspect of the MTD, the Bromley

2  Declaration was submitted only in support of Voyager UK's 12(b)(2) personal jurisdiction challenge,

3  and is not cited in the 12(b)(6) section of the MTD.  As the Ninth Circuit has long recognized, a court

4  may consider evidence outside of the pleadings when adjudicating a Rule 12(b)(2) motion to dismiss,

5  including affidavits.  *Doe v. Unocal Corp.*, 248 F.3d 915, 922 (9th Cir. 2001).  <u>Second</u>, although the

6  facts in a complaint are generally accepted as true on a motion to dismiss, the court "may not assume

7  the truth of allegations in a pleading which are contradicted by affidavit."  *Data Disc, Inc. v. Sys.*

8  *Tech. Assoc., Inc.*, 557 F.2d 1280, 1284 (9th Cir. 1977).  The unverified allegations in the FAC are

9  directly contradicted by the Bromley Declaration, which is the only sworn evidence of relevant

10 jurisdictional facts.  It establishes a lack of personal jurisdiction over Voyager UK under either a

11 contractual theory or a traditional "minimum contacts" analysis.

12     Meta is a frequent litigant in this Court, and its opposition relies heavily on prior cases to

13 which it was a party, and in which Meta contends that similar contractual allegations were sufficient.

14 But none of those cases concerned a challenge to the sufficiency of a contract claim; they all involved

15 either default judgments or an opposing party that conceded that a contract had been formed.  The

16 fact that Meta has been able to avoid pleading challenges in the past does not absolve it of its

17 obligation to plausibly plead contract existence/formation and to establish a prima facie case of

18 personal jurisdiction.  Meta has failed to do either, and its FAC should be dismissed with prejudice.

19     **I.**     **<u>Meta Fails to Plausibly Plead Breach of Contract</u>**

20         **A.**     **<u>Meta Fails to Plausibly Allege Existence of Agreement with Voyager UK</u>**

21     In its MTD, Voyager UK identified seven different <u>categories</u> of potential contracts in the

22 FAC's First Cause of Action: (1) Facebook's Terms of Service; (2) Facebook's Community Standards;

23 (3) Meta's Commercial Terms (but only "as applicable"); (4) other "rules that govern access to and

24 use of Facebook"; (5) Instagram's Terms of Use; (6) Instagram's Community Guidelines; and (7)

25 other "rules that govern access to and use of Instagram."  (MTD at 8 (quoting FAC ¶¶ 25, 26).)  Meta

26 does not contest that the FAC invokes these seven categories; instead, it contends that the FAC quotes

27 from portions of "Facebook's Terms of Services" and "Instagram's Terms of Use."  (Opp. at 8-9.)

28 Even if that is true, then by its own admission Meta has not quoted from or otherwise described the

1  relevant terms of any of the *other five categories of alleged contracts*.  Therefore, at a minimum, the

2  First Cause of Action fails to state a claim based on those five categories.[2]

3        Moreover, even assuming that Meta quoted from categories (1) and (4) above (a fact that is

4  not clear from the FAC itself), that still fails to place Voyager UK on notice of what contracts are

5  alleged to have been breached because: (i) Meta refuses to explain whether "as applicable, the Meta

6  Commercial Terms," means that those Terms supersede, supplement, or amend other contracts; and

7  (ii) Meta refuses to identify the version of the contracts that Voyager UK allegedly entered.[3]

8        Instead, Meta relies entirely on inapposite caselaw involving either default judgments;[4] a

9  concession that a contract had been formed;[5] or traditional written contracts.[6]  None of that caselaw

10  supports the view that when a party has not conceded that it entered an online adhesion contract, the

11  bare allegations in the FAC are sufficient.

---

[2] Contrary to Meta's characterization, Voyager UK did not argue that the contracts-at-issue had to be attached to the FAC or quoted verbatim.  Voyager UK argued that the FAC failed to put it on notice of what was meant by the seven categories of contracts in the FAC, and that the easiest way to remedy that would have been to attach the alleged online adhesion contracts, which Meta did not.

[3] Meta's opposition emphasizes that certain of its terms were referenced in an October 16, 2017 letter. (Opp. at 9 (citing Ex. 4 to FAC at 2).)  But that letter identifies three different categories, none of which are the basis for the First Cause of Action.  (*See* Ex. 4 to FAC at 2 (referencing "Statement of Rights and Responsibilities," "Facebook Platform Policies," and "Instagram API Terms of Use").)  It is not clear whether the foregoing materials overlap with those in the FAC, and whether, for instance, Meta contends that because Voyager UK was allegedly on notice of the 2017 version of "Facebook Platform Policies," Voyager UK was bound by the 2022 version of Facebook Terms of Use.

[4] *Facebook, Inc. v. Sluchevsky*, 19-cv-1277, 2020 WL 5823277 (N.D. Cal. Aug. 28, 2020), *report and recommendation adopted*, 2020 WL 5816578 (N.D. Cal. Sept. 30, 2020); *Meta Platforms Inc. v. Soc. Data Trading Ltd.*, 21-cv-09807, 2022 WL 18806267 (N.D. Cal. Nov. 15, 2022), *report and recommendation adopted*, 2022 WL 18806265 (N.D. Cal. Dec. 8, 2022).

[5] *Williams v. Apple, Inc.*, 449 F. Supp. 3d 892, 907-08 (N.D. Cal. 2020) (consumers invoked iCloud terms); *Meta Platforms, Inc. v. BrandTotal Ltd.*, 605 F. Supp. 3d 1218, 1257 (N.D. Cal. 2022) (no dispute as to contract existence or formation through account creation).

[6] *See, e.g., Misha Consulting Grp., Inc. v. Core Educ. and Consulting Solutions, Inc.*, No. 13-cv-04262, 2013 WL 6073362, at *2 (N.D. Cal. Nov. 15, 2013) (written contract entered via email correspondence in 2013); *James River Ins. Co. v. DCMI, Inc.*, No. 11-cv-06345, 2012 WL 2873763, at *3 (N.D. Cal. July 12, 2012) (written contract for procurement of "commercial general liability insurance"); *Kaar v. Wells Fargo Bank, N.A.*, No. 16-cv-01290, 2016 WL 3068396, at *1 (N.D. Cal. June 1, 2016) (written loan agreement); *Dependable Highway Express, Inc. v. RIM Logistics, Ltd.*, No. 18-cv-04261, 2018 WL 7500276, at *1 (C.D. Cal. Sept. 10, 2018) (written contract for transport of shipping containers); *Wynes v. Kaiser Permanente Hosps.*, No. 10-cv-0702, 2011 WL 1302916, at *11 (E.D. Cal. Mar. 31, 2011) (written employment agreement).

1

### B. Meta Fails to Plausibly Allege That Voyager UK Manifested Assent

2    Meta argues that it has plausibly pleaded that Voyager UK manifested assent to some set of

3 "Terms" because of three allegations in the FAC: (i) Facebook or Instagram allegedly cannot be used

4 without agreeing to their terms; (ii) Voyager UK allegedly created and used multiple Facebook and

5 Instagram accounts; and (iii) Voyager UK received actual notice of "Facebook's and Instagram's

6 Terms." (Opp. at 10-13.) Even assuming that those allegations are true, the FAC falls far short of

7 the threshold showing required for breach of an online adhesion contract.

8    Meta's *first* argument is flawed in multiple respects. As an initial matter, Meta ignores the

9 critical question that must be answered when assessing the sufficiency of the FAC:  is the contract

10 (or contracts) that Voyager UK is alleged to have entered with Meta a clickwrap agreement, a

11 browsewrap agreement, or something else?  The FAC does not answer that question, and neither does

12 Meta's opposition.  Meta fails to acknowledge the fundamentally distinct standards that apply to these

13 fundamentally distinct online adhesion contracts, and improperly collapses two different analytical

14 frameworks into one.  While Meta cites *Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171 (9th Cir.

15 2014), this case aptly demonstrates Meta's error, because it delineates the two "flavors" of "[c]ontracts

16 formed on the Internet": "'clickwrap' (or 'click-through') agreements in which website users are

17 required to **click on an "I agree" box** after being presented with a list of terms and conditions of use,

18 and 'browsewrap' agreements, where a website's terms and conditions of use are generally posted on

19 the website via a hyperlink."  763 F.3d at 1175-76.  The Ninth Circuit recently reaffirmed this

20 distinction, noting that there is a "spectrum" of online adhesion contracts—with clickwrap

21 agreements providing *actual notice* of their terms and requiring specific manifestation of assent to

22 them on one end, and with browsewrap agreements on "the other end of the spectrum," because "the

23 user supposedly manifests assent" by merely continuing to use a website after terms of an agreement

24 are disclosed through a hyperlink.  *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 856 (9th

25 Cir. 2022).  Voyager UK's MTD properly applies the Ninth Circuit's analytical framework by trying

26 to determine where the seven categories of contracts in the First Cause of Action fall on the

27 "spectrum" of online adhesion contracts.  Meta's opposition ignores that spectrum entirely.

28

1    In any event, the FAC indisputably fails to allege that Voyager UK clicked on any "I agree"

2   button to specifically manifest assent to any of the seven categories of contracts referenced in the

3   First Cause of Action.  Meta has thus failed to state a claim for breach of a clickwrap agreement.

4   Instead, Meta's opposition relies on two insufficient tactics: (i) citing *Fteja v. Facebook*, 841 F. Supp.

5   2d 829, 835 (S.D.N.Y. 2012); and (ii) placing quotation marks around "click"-related terms that do

6   not appear in the FAC. (Opp. at 12-13.)  As for Meta's first tactic, the *Fteja* decision only underscores

7   the FAC's deficiencies.   In *Fteja*, Facebook affirmatively alleged that "a putative Facebook user

8   cannot become an actual Facebook user unless and until ***they have clicked through the registration***

9   ***page where they acknowledge they have read and agreed to Facebook's terms of use.***"  841 F. Supp.

10  2d at 834.[7]   Meta makes no such allegation here—nor does it contend that the process used to sign

11  up for Facebook in 2011-2012 (i.e., at the time of the representations in *Fteja*) is the same as the

12  process that Voyager UK allegedly used at later time(s).[8]   And of course, the *Fteja* decision says

13  nothing about the process used to sign up for an Instagram account at any time.  As for Meta's second

14  tactic, the Court should not allow the FAC to be rewritten in Meta's opposition brief.  For instance,

15  Meta cites the FAC's allegation that Voyager UK "'logged in'" to certain accounts, which Meta states

16  "could have occurred only if the user ***clicked 'sign up'*** and manifested assent to be bound by

17  Facebook's Terms."  (Opp. Br. at 12 (citing FAC ¶¶ 50, 61, 63–64).)  While the FAC does allege that

18  Voyager UK "logged in" to certain accounts, the FAC does ***not*** allege that Voyager UK ever "clicked

19  'sign up'"—despite Meta's attempt to make it seem like it is quoting a phrase from the FAC, the words

20  "sign up" never appear in the FAC.  The FAC is completely silent as to what, if anything, Voyager

21

22  [7] Meta's predecessor (Facebook) made a similarly detailed allegation in *Franklin v. Facebook Inc.*,
    No. 1:15-cv-655-LMM, 2015 WL 7755670, at *1 (N.D. Ga. Nov. 24, 2015), asserting that "the
23  Facebook registration process ***in place at the time Plaintiff registered*** for an account informed people
    [that] 'By clicking Sign Up, you are indicating that you have read and agree to the Terms of Use,'"
24  which was "an underlined hyperlink directing users to [Facebook's Statement of Rights and
    Responsibilities]." *Id.*  The FAC does not describe the registration process that Voyager UK is alleged
25  to have used or any hyperlinks it allegedly would have encountered.

26  [8] The same is true for the cases Meta cites in footnote 6 of its opposition; Meta does not allege that
    Voyager UK would have seen the same website or used the same registration process as those at issue
27  in cases from as early as 2010 or 2013.  Meta must identify the particular version of its website that
    it contends gave rise to a binding contract with Voyager UK—as this Court recognized in a case cited
28  in Meta's opposition.  *See Snow v. Eventbrite, Inc.*, No. 20-cv-03698, 2021 WL 3931995, at *4 (N.D.
    Cal. Sept. 2, 2021) (noting that a representation of how a website "looked in January 2016" was
    insufficient absent facts as to how the website looked when the contract was allegedly formed).

1   UK is alleged to have "clicked" that would have manifested assent to each of the seven categories of

2   contracts in the First Cause of Action.  Meta has therefore failed to plausibly allege that Voyager UK

3   manifested assent to a clickwrap contract with Meta.

4   Meta's contention that "a person cannot use Facebook or Instagram without agreeing to their

5   Terms" likewise fails to state a claim for breach of a browsewrap contract, because it only begs the

6   question:  assuming for the sake of the MTD that Voyager UK has used Facebook or Instagram, ***how***

7   is Voyager UK alleged to have agreed to all the terms that relate to Facebook or Instagram?  Meta

8   appears to argue that Voyager UK was on "inquiry notice" of those terms, (Opp. at 10), but according

9   to the very caselaw that Meta cites, "[w]hether a user has inquiry notice of a browsewrap

10  agreement . . . depends on the design and content of the website and the agreement's webpage."

11  *Nguyen*, 763 F.3d at 1177.  The FAC contains no allegations as to the "design and content of the

12  [Facebook and Instagram] website[s] and the agreement's webpage."  And Meta does not even attempt

13  to distinguish the single-most analogous case regarding what is required to plead breach of a

14  browsewrap contract: *Be In, Inc. v. Google Inc.*, No. 12-cv-3373, 2013 WL 5568706 (N.D. Cal. Oct.

15  9, 2013).  In that case, Judge Koh dismissed contract claims because the plaintiff's complaint "fail[ed]

16  to provide factual grounding from which [the plaintiff] can show the formation of a contract."  *Id.* at

17  *6.  In particular, the plaintiff alleged that "Defendants agreed to the Terms of Service when they

18  used and/or visited the CamUp website," but "provide[d] no grounds, beyond the mere existence of

19  a link, for the Court to find that Defendants were on notice that mere use of the website would be

20  interpreted as agreement to the Terms of Service." *Id* at *9.  This Court then announced the standard

21  that applies to pleading breach of a browsewrap contract:  "a complaint must state facts establishing

22  the means by which the link in question would give notice to a reasonably prudent internet user." *Id.*

23  Just as the complaint in *Be In* failed to provide those facts, so too does the FAC—indeed, the term

24  "notice" never even appears in the FAC.  That is fatal to the FAC's First Cause of Action.  *See id.*;

25  *see also Olney v. Job.com, Inc.*, No. 1:12-cv-01724-LJO-SKO, 2014 WL 4660851 (E.D. Cal. Sept.

26  17, 2014) (dismissing breach claim where complaint merely alleged that third-party defendants

27  "agreed to be bound by the terms as a condition of their use of Job.com" without factual support).

28

1     Meta's second argument—that Voyager UK has created Facebook or Instagram accounts—is

2 similarly unavailing.  As discussed above, even assuming that Voyager UK created the accounts listed

3 on pages 12-13 of Meta's opposition, that again begs the question: how, through the creation of those

4 accounts, is Voyager UK alleged to have manifested assent to the seven categories of contracts in the

5 First Cause of Action?  What buttons were clicked; what hyperlinks were presented; what text was

6 visible to Voyager UK?  None of those questions are answered by either the FAC or Meta's

7 opposition.  Without any details as to how any of the online adhesion contracts are alleged to have

8 been formed, Meta cannot satisfy the *Nguyen/Berman* standard of pleading "inquiry notice."

9     Meta tries to fill the foregoing gaps in two untenable ways.  *First*, Meta cites a series of default

10 judgments in which the sufficiency of the pleadings was not contested.  (Opp. at 11.)  Those default

11 judgments cannot establish any facts from which it could be plausibly concluded that Voyager UK

12 entered into seven categories of contracts with Meta by creating accounts.  *Second*, Meta misleadingly

13 quotes language that is not from the FAC, and that is not from Facebook or Instagram, to try to mask

14 the lack of details in its FAC.  For instance, Meta states that "Facebook's and Instagram's Terms are

15 'provided simultaneously to enrollment, thereby connecting the contractual terms to the services to

16 which they apply.'"  (Opp. at 11.)  But that quotation does not describe "enrollment" in Facebook or

17 Instagram (or any allegation in the FAC); it describes the process of creating **an Uber account** as set

18 forth in *Meyer v. Uber Techs., Inc.*, 868 F.3d 66, 78 (2d Cir. 2017).  Indeed, after reading the *Meyer*

19 decision, the Court would know a great deal more about how Uber works—including the language

20 with the "registration button" presented to Uber users and accompanying "hyperlinks"—than it would

21 about how Facebook and Instagram worked at the time Voyager UK is alleged to have entered

22 contracts via those websites.  Meta cannot remedy the deficiencies in its FAC by relying on a

23 description of how Uber allegedly forms contracts with its users; indeed, *Meyer* demonstrates how

24 Meta's allegations fall far short of meeting the threshold of plausibility.

25     Meta's opposition also relies heavily on an allegedly fake Facebook account under the name

26 "Olga Herrera" to support its claim that it has sufficiently pleaded the existence of a contract.  (Opp.

27 at 12-13.)  That reliance is misplaced, not least because Meta previously argued that this account

28 allegedly resulted in a formation of a different contract—Facebook's EU Terms of Use—with a

different entity—Meta Platforms Ireland Limited ("Meta Ireland"). (*See* Dkt. 53-6, ¶¶ 3, 4.)[9] Meta Ireland is not a party to this action, and Facebook's EU Terms of Use are not asserted in the First Cause of Action. Meta's repeated invocations of alleged actions by Voyager UK relating to "fake accounts" has nothing to do with whether Voyager UK was on inquiry notice that it was assenting to a browsewrap contract with Meta. Similarly misplaced is Meta's argument that Exhibits 3 and 5 to the FAC support the inference that Voyager was on inquiry notice of any terms that are the subject of the First Cause of Action. (Opp. at 14.) Those exhibits (i) do not describe the design or content of Facebook or Instagram; (ii) do not refer to any terms or conditions applicable to Facebook or Instagram; and (iii) do not contain facts from which a reasonable factfinder could conclude that Voyager UK agreed to be bound to any contract, whether through the creation of the alleged "fake" accounts or otherwise. They thus provide no evidence of inquiry notice to Voyager UK.

Meta's <u>third</u> argument—that Voyager UK was on actual notice of the terms of the contracts at issue from correspondence that it sent in October 2017—likewise misses the mark. The October 2017 correspondence ostensibly references the 2017 version of (i) the "Statement of Rights and Responsibilities"; (ii) "Facebook Platform Policies"; (iii) "Instagram Terms of Use"; and (iv) "Instagram API Terms of Use." (FAC, Ex. 4 at 2.) It is not clear whether these terms—three of which refer to categories that are not among the seven categories in the First Cause of Action—are the same as those referenced in the FAC, or whether the 2017 version is the same as any versions that Voyager UK is alleged to have breached. Meta cites no instance when this sort of correspondence—referencing sets of different terms from a different time from those at issue in the FAC—was deemed sufficient to constitute actual notice giving rise to online contract formation.

C. <u>**Meta Fails to Sufficiently Allege Alter Ego or Agency Liability**</u>

Meta sharply criticizes Voyager UK for addressing alter ego or agency theories of liability, going so far as to characterize this portion of the MTD as a "strawman"—because according to Meta,

---

[9] This letter is referenced in paragraph 64 of the FAC, and therefore can be considered as part of the 12(b)(6) challenge. *See, e.g.*, *Finkelstein v. AXA Equitable Life Ins. Co.*, 325 F. Supp. 3d 1061, 1066 (N.D. Cal. 2018) (on a MTD, the court "may take into account documents that are not physically attached to the complaint if the contents of the document are alleged in the complaint and the authenticity of the documents is not questioned"); *Brooke v. Patel*, No. 1:20-cv-1106 JLT EPG, 2023 WL 2645648, at *5 n.2 (E.D. Cal. Mar. 27, 2023) ("Where a complaint references communications, including emails, courts have determined . . . [they] may be considered with the [MTD].").

1   the FAC does not plead alter ego or agency.  Instead, Meta twice declares that "[a]ll of the FAC's

2   allegations are directed at Voyager [UK]"[10] and it would not be proper to perform "any alter-ego or

3   agency analysis."  (Opp. at 15.)  But then the next four pages of Meta's opposition are devoted to

4   precisely the opposite proposition—that Meta ***did in fact*** allege alter ego and agency liability.  At any

5   rate, Meta has not plausibly pleaded that Voyager UK is liable under either alter ego or agency theory.

6           *First*, the FAC fails to satisfy either the "unity of interests" or "inequitable results" prongs of

7   the alter ego test.  Meta's "unity of interest" allegations are based on a single document:  the 2021

8   consolidated financial statement ("CFS") from Voyager UK and the Non-Party Entities.  Meta's

9   reliance on the CFS ignores the caselaw that Voyager UK cited, which noted that "consolidated

10  financial statements are insufficient to satisfy the alter ego test."  *Uniloc 2017 LLC v. H&R Block,*

11  *Inc.*, No. SACV 19-1149 JVS, 2019 U.S. Dist. LEXIS 229166, at *10 (C.D. Cal. Dec. 23, 2019).

12  Meta appears to have confused traditional consolidated financial reporting with improper

13  commingling of funds, and cites no authority for the principle that consolidated UK financial

14  statements render the entire Voyager corporate structure a sham.  Instead, Meta's cited cases are either

15  distinguishable based on their far more extensive factual record,[11] or support dismissal of the FAC.[12]

16          Meta argues that "[t]he Court need look no further than Voyager [UK]'s own statement that

17  its 'subsidiaries are all entities over which the Group has control.'"  (Opp. at 17-18.)  But that is

---

18

19  [10] Meta asserts that any time an entity identifies itself as "Voyager Labs" in Exs. 3 and 5 to the FAC,
    that must be Voyager UK.  This argument should be rejected.  First, it contradicts the FAC's allegation

20  that "at least Voyager Labs Ltd. and Voyager Analytics, Inc. both operate under the name 'Voyager
    Labs.'"  (FAC ¶ 7.)  That means that a reference to "Voyager Labs" could just as easily be referring

21  to Voyager Analytics, Inc.  Second, Meta's cited materials explicitly clarify that "Voyager Labs"
    could refer to Voyager UK or to any of "its affiliates."  (Opp. at 16 (citing FAC Ex. 3 at 116).)

22
    [11] *See Estate of Miller v. Cnty. of Sutter*, No. 2:20-cv-577-KJM-DMC, 2020 WL 6392565 (E.D. Cal.

23  Nov. 2, 2020) (complaint included "dozens of paragraphs" relating to alter ego allegations, including
    that defendant used alter egos as instruments "to artificially divorce its profits from its liabilities,"

24  and to direct the "day-to-day operations by . . . installing executives and board members"); *City &
    Cnty. of San Francisco v. Purdue Pharma L.P.*, 491 F. Supp. 3d 610, 637-38 (N.D. Cal. 2020)

25  (complaint alleged that parent's control "encompasses its subsidiaries' day-to-day activities," and that
    parent "used its subsidiaries' cash flows to repurchase its own shares and pay dividends to

26  shareholders"); *Ind. Elec. Supply Inc. v. Solar Installs, Inc.*, No. 4:18-cv-1435, 2018 WL 6092800, at
    *4-5, *8 (N.D. Ca. Nov. 21, 2018) (complaint alleged that "[t]he president of one company" had "sole

27  authority to" control "the purse strings of another allegedly separate company," and that one
    defendant explicitly held itself out as responsible for co-defendant's debts to the plaintiff)

28
    [12] *See Ranza v. Nike Inc.*, 793 F.3d 1059 (9th Cir. 2015) (employer was not an alter ego of its parent
    corporation despite the fact that parent was "heavily involved in [subsidiary's] operations").

literally the definition of a subsidiary,[13] and if the mere right of a parent to assert control over a subsidiary were sufficient to confer alter ego liability, then every parent-subsidiary relationship would trigger the rare exception to corporate formalities—making the exception the rule.  Indeed, the 2021 CFS shows only a standard corporate relationship in which all ordinary corporate formalities are assumed; Meta has identified nothing exceptional.  Indeed, Meta repeatedly mischaracterizes the 2021 CFS.  For instance, Meta contends that Voyager UK and the Non-Paty Entities "disregard . . . corporate formalities."  But according to the CFS, Voyager UK "entered into distribution agreement and management services with Bionic 8 Analytics . . . under terms that are no less favourable to the Group than those arranged with third parties," and received nearly $4 million in services pursuant to those arms-length arrangements in 2021.  (Ex. 1 to FAC at 34-35.)  That is the opposite of the corporate disregard; corporate formalities are observed to the point that there are inter-Group service contracts.  And while Meta contends that Voyager UK enters into lease agreements for its subsidiaries, the CFS notes that multiple Non-Party Entities executed their own leases.  (Ex. 1 to FAC at 31.)  Meta also does not identify a single officer that is the same for Voyager UK and any one of its subsidiaries, and does not identify a single individual that is employed by more than one member of the "Group" discussed in the statement.  Meta has thus failed to plausibly allege "unity of interest."

_Second,_ Meta claims that it "alleged inequitable results," (Opp. at 18), but then ***fails to cite any such allegations from the FAC***.  Meta cannot use its opposition as yet another amendment to its pleading, and the failure to plead any inequitable results along compels dismissal of any claim based on alter ego liability.  _See Women's Recovery Ctr., LLC v. Anthem Blue Cross Life & Health Ins. Co._, No. 8:20-cv-00102-JWH-ADSx, 2022 WL 739522, at *4 (C.D. Cal. Feb. 2, 2022).

_Finally_, as for Meta's allegations of agency liability, it is not even clear who is alleged to be an agent of whom.  In any event, Meta offers two arguments in its opposition (neither of which is pleaded): (i) if an entity identifies itself as "Voyager Labs," that gives rise to the inference that it must be an agent of Voyager UK; and (ii) if an individual identified herself as an employee of "Voyager Labs," that gives rise to the inference that she must be an agent of Voyager Labs.  Both of those

---

[13] _See_ Black's Law Dictionary (2d ed.) (defining "subsidiary" as an "[e]nterprise that is controlled by another owning more than 50% of voting stock").

1 theories fail based on the actual allegation in Meta's FAC, which is that Voyager Analytics Inc. uses

2 the common marketing term "Voyager Labs" in connection with its own business.  (FAC ¶ 7.)

3     **II.     The Court Lacks Personal Jurisdiction Over the CFAA and CDAFA Claims**

4         Meta offers three bases for personal jurisdiction over Voyager UK for the CFAA and CDAFA

5 Claims: (i) Voyager UK waived personal jurisdiction for all Meta-related claims in its CMS and in

6 prior correspondence; (ii) Voyager UK waived personal jurisdiction for the CFAA and CDAFA

7 claims based on the forum-selection clause certain of Meta's terms; and (iii) Voyager UK has

8 minimum contacts with California.  Meta has failed to satisfy its burden of showing that any of the

9 foregoing establishes personal jurisdiction over Voyager UK for the CFAA and CDADA claims.

10     **A.   The Bromley Declaration is Fatal to Meta's Personal Jurisdiction Theories**

11         The Bromley Declaration specifically addresses each of Meta's arguments for personal

12 jurisdiction, and refutes them all:

13   - *Alleged Waiver by Prior Correspondence*:  "[I]n the context of communications
14     between counsel for Meta and counsel for Voyager UK that occurred before Meta
      filed its original Complaint in this action, Voyager UK agreed not to contest
15     personal jurisdiction solely for claims brought by Meta for breach of contract in
      California (but did not make such an agreement for any other claims)."  (Dkt. 50-
16     2, ¶ 20)

17   - *Applicability of Forum Selection Clause*:  "Voyager UK does not have, and has
      never had, multiple Facebook and Instagram accounts, and never agreed to any
18     terms of service or use associated with Facebook or Instagram, and therefore
      never agreed to any forum selection clause . . . ."  (*Id.*)
19

20   - *Minimum Contacts*:  "Voyager UK does not lease or own an office or otherwise
      have any presence in California.  Voyager UK is also not registered with the
21     Secretary of State of California to do business in California. . .  and provides no
      services for any California-based customers; has no contracts that were made in
22     California; has no contracts that are governed by California law; and does not
      market sell, or offer for sale any products in California."  (*Id.*, ¶¶ 11-13, 21.)
23

24 The Bromley Declaration also specifically refutes a litany of allegations in the FAC by attesting that

25 (i) none of the individuals in Exs. 3 and 5 to the FAC, or those identified as "Voyager Employees 1,

26 2, and 3," were employed by Voyager UK at the time of the relevant communications or actions (*id.*,

27 ¶¶ 16, 17); (ii) Voyager UK has never marketed, offered, or distributed any software to the Los

28 Angeles Police Department ("LAPD") (*id.*, ¶ 21); and (iii) no director, officer, employee, agent, or

1   representative of Voyager UK created or used the Facebook/Instagram accounts identified in the FAC

2   (*id.*, ¶¶ 23, 25).

3        Meta does not address the Bromley Declaration, except to incorrectly contend that "the Court

4   cannot consider the Bromley Declaration in deciding this motion," and that "even if it were

5   considered, any factual dispute it creates must be resolved in Meta's favor." (Opp. at 14-15.) Meta's

6   position is wrong in several respects. <u>*First*</u>, it is contrary to the well-established law of the Ninth

7   Circuit, which provides that on a Rule 12(b)(2) motion, "[t]he court may consider evidence presented

8   in affidavits to assist it in its determination." *Unocal*, 248 F.3d at 922; *see also ThermoLife Int'l, LLC*

9   *v. NetNutri.com LLC*, 813 F. App'x 316, 318 (9th Cir. 2020) (affirming dismissal for lack of personal

10  jurisdiction based on an "uncontroverted declaration" from the defendant); *Born v. Celtic Mktg. LLC*,

11  No. 8:19-cv-01950 (JLS) (ADS), 2020 WL 3883273, at *4 (C.D. Cal. May 20, 2020) (dismissing for

12  lack of personal jurisdiction in part based on declarations). <u>*Second*</u>, Meta itself submitted and cited

13  two declarations to support its arguments relating to personal jurisdiction. (*See* Opp. at 19-25.) <u>*Third*</u>,

14  Meta's declarations do not address the allegations in the Bromley Declaration—they never cite any

15  of those allegations, or submit any evidence that contradicts Ms. Bromley's sworn statements. There

16  are thus no factual disputes to be decided in Meta's favor; the only evidence of record is from Voyager

17  UK. *See, e.g.*, *Precision Transducer Sys. v. STFO Trading LLC*, No. 09-cv-4245, 2009 WL

18  10700319, at *4 (C.D. Cal. Oct. 15, 2009) (granting dismissal of two defendants where "Plaintiff has

19  failed to submit any declarations that contradict [defendants'] declarations regarding personal

20  jurisdiction"). The Bromley Declaration is alone dispositive of Meta's personal jurisdiction

21  allegations, and Meta's decision to ignore it compels dismissal of the CDAA and CDAFA claims.

22          **B.  <u>Voyager UK Did Not Waive Jurisdiction in the CMS or Prior Correspondence</u>**

23          Meta argues that Voyager UK waived its right to challenge personal jurisdiction as to the

24  Second and Third Causes of Action in (i) the CMC Statement; and (ii) in a December 8, 2022 letter

25  (submitted as Ex. 4 to the Jiang Declaration). Not so. Both of Voyager UK's statements were

26  specifically limited to Meta's breach of contract claim.

27          Meta's original complaint asserted only a single "Cause of Action" for breach of contract, and

28  did not assert claims under the CFAA or CDAFA. (Dkt. 1 at pgs. 19:1-20:76.) Thus, when Voyager

UK stated in its original CMS that it "agreed not to contest the exercise of personal jurisdiction over it by this Court solely for purposes *of this action*," (Dkt. 35, ¶ 1), Voyager UK was necessarily addressing only the action as it existed as of April 11, 2023—i.e., as a single cause of action for breach of contract.  Similarly, in the December 8 letter, Voyager UK began by noting that Meta's "claims are for alleged violations of the terms of various alleged contracts, as identified in paragraph 4 of the [Letter Before Action dated 11 November 2022, the 'LBA']." (Dkt. 53-6, ¶ 3.)  Voyager UK than noted that it was "prepared to submit to the jurisdiction of the US District Court for the Northern District of California and of any state court located in San Mateo County *for the purposes of resolving the allegations contained in the LBA*." (*Id.*, ¶ 9.)  Just as Meta's allegations in the original Complaint were limited to breach of contract, so too were the "allegations contained in the LBA." (*Id.*)  Meta had never given any indication to Voyager UK that it intended to assert claims under the CFAA or CDAFA prior to the filing of its FAC on May 5, 2023—a fact that Meta does not dispute.  In retrospect, it seems Meta may have engaged in a bait-and-switch, initially indicating its intent to assert only a single claim and then, once Voyager UK had agreed not to contest personal jurisdiction for that claim, radically expanding the scope of the action in which that single claim was asserted. The Court should not retroactively transform Voyager UK's limited waiver of personal jurisdiction into a broad, blanket waiver that applies to claims that were unknown to Voyager UK at the time of the limited waiver.[14]

---

[14] Meta also appears to invoke the doctrine of pendent personal jurisdiction (albeit not by name), arguing that because the CFAA and CDAFA claims arise out of the same "common nucleus of operative facts" as Meta's breach of contract claim (for which personal jurisdiction is not contested), then the Court has "personal jurisdiction over all claims." (Opp. at 20-21.)  The Court should reject the application of this discretionary doctrine for several reasons. *First*, the CFAA and CDAFA claims do not arise out of the same common nucleus of operative facts as the breach of contract claim.  While the breach of contract claim depends on particular terms of use allegedly governing Meta's platforms and Voyager UK's particular conduct, the CFAA and CDAFA claims are based not on an alleged violation of usage terms, but instead on a violation of a blanket prohibition on access. *Second*, if Meta's breach of contract claim is dismissed, then there is no "anchor" claim from which to exercise pendent jurisdiction, and the discretionary exercise of such jurisdiction would be improper. *See Goldberg v. Rome McGuigan, P.C.*, No. 20-cv-9958-JFW (SKx), 2021 WL 3520725, at *4 (C.D. Cal. Apr. 23, 2021). *Third,* it would be unfair to Voyager UK for the Court to exercise its discretionary pendent jurisdiction where Meta could have earlier raised the CFAA and CDAFA claims, but instead concealed its intent to assert those claims from Voyager UK until it had extracted Voyager UK's pledge not contest personal jurisdiction for the breach of contract claim. *See, e.g., Action Embroidery Corp. v. Atl. Embroidery, Inc.*, 368 F.3d 1174, 1181 (9th Cir. 2004).  Indeed, by Meta's own account, it was aware of the basis for the CFAA and CDAFA claims since it allegedly revoked Voyager UK's access to Facebook in 2017 (Opp. at 24)—nearly six years before it first surfaced these claims.

1

### C.  **Meta's Forum-Selection-Clause Theory Fails**

2      The Bromley Declaration—the only sworn evidence in this case—establishes that Voyager

3   UK never agreed to any forum selection clause, including because it never created any of the

4   accounts referenced in the FAC.  (Dkt. 50-2, ¶¶ 16, 17, 20, 23, 25.)  In response, Meta relies on the

5   FAC and the Chmelar Declaration, but that cannot satisfy its burden of showing that personal

6   jurisdiction exists over Voyager UK.  *First*, the FAC is unverified, and while the truth of the

7   allegations therein must be assumed for purposes of Voyager UK's Rule 12(b)(6), that is not true for

8   Voyager UK's Rule 12(b)(2) challenge.  *See, e.g.*, *Klian v. Crawford*, No. 12-cv-2373, 2012 WL

9   12878721, at *2 (C.D. Cal. June 6, 2012) (declining to consider unverified complaint on challenge

10  to personal jurisdiction because it "does not constitute evidence").  *Second*, the Chmelar Declaration

11  does not refute any of the Bromley Declaration—it merely submits three sets of "Facebook Terms"

12  that Mr. Chmelar states were generally in effect from July 2022 to May 2023.  Neither the Chmelar

13  Declaration, nor any other sworn evidence from Meta, supports the view that Voyager UK agreed

14  to any of those three sets of terms, or the forum selection clauses appearing therein.[15]  Meta thus

15  has no evidence to refute the sworn Bromley Declaration.

16      Meta also makes much of the fact that Voyager UK's pre-litigation correspondence

17  references one of Meta's forum selection clauses.  (Opp. at 22.)  But Meta's argument omits critical

18  context.  Meta had threatened to file suit against Voyager UK for breach of contract in the United

19  Kingdom based on a European contract with Meta Ireland.  (*See* Dkt. 53-6.)  But Voyager UK

20  noted that the claims that Meta had raised appeared to be based on "non-European terms," and that

21  in at least one version of those terms, *Meta* (not Voyager UK) had agreed that when those non-

22  European terms were allegedly at issue, then the dispute would have to be resolved exclusively in

23  this Court.  (*Id.*)  Voyager UK's statements do not represent an agreement to be bound by any forum

24  selection clause, nor an acknowledgement that it had previously been so bound.

25

26

27

28

[15] It is unclear why the Chmelar Declaration attaches the Facebook's Terms of Service for Israel, which include a different forum selection clause from the other two sets of terms; those Israeli Terms are not referenced in the FAC, nor in Meta's opposition.  Meta apparently has not yet made up its mind as to whether it is going to contend that Voyager UK also agreed to those Israeli Terms.

**D.  Meta Fails to Refute Voyager UK's Evidence That It Lacks "Minimum Contacts"**

Meta relies exclusively on the FAC and its exhibits in connection with its argument that Voyager UK—a foreign entity with no presence in California—nonetheless has "minimum contacts" with California that subject it to personal jurisdiction here.  For the reasons discussed above, that is unavailing, because the sworn Bromley Declaration refutes each of the relevant allegations, including those relating to the alleged LAPD contacts.  (Dkt. 50-2, ¶¶ 11-13, 16, 17, 19, 21, 24, 25.)  Meta offers no evidence to the contrary.

Moreover, notwithstanding Meta's decision to ignore the Bromley Declaration, Meta also inexplicably ignores the leading Supreme Court case (and its progeny) upon which Voyager UK's MTD was based:  *Walden v. Fiore*, 571 U.S. 277 (2014).  In that case, the Supreme Court specifically rejected the idea that even if Voyager UK's actions—which are not alleged to have been taken by Voyager UK in California—affected California residents, that *injury-focused* approach is insufficient to satisfy the *conduct-focused* "minimum contacts" test.  *Id.* at 289-90.  Rather than confront that dispositive caselaw, Meta turns again to a series of default judgments that it obtained, none of which involved a consideration of *Walden*.  (Opp. Br. at 23 (citing default judgments in *Sluchevsky*, *Social Data*, and *Sahinturk*).)  Meta also cites a case in which defendants were alleged to have sought out "WhatsApp's California-based servers for the purpose of routing malicious code through those servers."  (Opp. at 23.)  But Meta does not allege that Voyager UK sought out *California-based servers*; the FAC does not identify where Meta's servers are located, and the only server referenced in the FAC is an Amazon server allegedly located in Virginia.  (FAC, ¶ 53.)

## CONCLUSION

For the above reasons, and those in the MTD, the FAC should be dismissed with prejudice.

Dated:  July 14, 2023

GISH PLLC

By: */s/ Edward L. Tulin*
EDWARD L. TULIN
Attorneys for Defendant Voyager Labs Ltd.